IN THE COURT OF APPEALS OF THE STATE OF IDAHO
Docket No. 42260

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENTAL RIGHTS OF JANE DOE (2014-16) | ) ) ) | |
| IDAHO DEPARTMENT OF HEALTH & WELFARE, | ) ) ) | 2014 Unpublished Opinion No. 792 |
| Petitioner-Respondent, | ) ) ) | Filed: October 30, 2014 |
| and | ) ) | Stephen W. Kenyon, Clerk |
| GUARDIAN AD LITEM, | ) ) ) | THIS IS AN UNPUBLISHED OPINION AND SHALL NOT BE CITED AS AUTHORITY |
| Respondent on Appeal, | ) ) | |
| v. | ) ) | |
| JANE DOE (2014-16), | ) ) | |
| Respondent-Appellant. | ) ) ) | |

Appeal from the Magistrate Division of the District Court of the Fifth Judicial District, State of Idaho, Twin Falls County. Hon. Roger B. Harris, Magistrate.

Order terminating parental rights, affirmed.

Williams Law Office Chtd.; Timothy J. Williams, Twin Falls, for appellant.

Jamie LaMure, Twin Falls, for guardian ad litem.

Hon. Lawrence G. Wasden, Attorney General; James T. Baird, Deputy Attorney General, Twin Falls, for respondent.

GRATTON, Judge

Jane Doe (Mother) appeals from the magistrate's order terminating her parental rights. We affirm.

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

The Idaho Department of Health & Welfare (the Department) filed a petition seeking to terminate the parental rights of Mother and the biological father of Z.C., a female child born in March 2010. The father consented to his parental rights being terminated. Mother contested the termination. At the time of trial, Mother had four children: Z.C., age four; B.C., age two and a half; J.C., age one and a half; and L.C., four months. Upon hearing testimony from a number of witnesses, the magistrate made the following findings in its memorandum decision. In 2010, the Oregon Department of Health and Welfare removed Z.C. from Mother's care based on her alleged neglect of the child, as well as failure to provide a safe and stable home environment. Oregon established a case plan, which included visitation with the child. Mother quit exercising her visitation rights with Z.C. in 2012. Mother was unemployed and homeless much of the time she lived in Oregon. Between 2010 and 2013, Mother continued to associate with violent men, having two more children (B.C. and J.C.) before moving to Idaho. From this, the Oregon Department of Health and Welfare discontinued reunification efforts with Mother and placed Z.C. with her biological father who was living in Idaho.

Z.C. lived with her father from July 2012 to January 2013. Z.C. was removed from her father's care because he physically abused her. Mother did not attend the initial shelter care hearing, but did attend the adjudicatory hearing in March 2013. Due to the Department's concerns relating to Mother's use of controlled substances, the Department conducted a welfare check at the motel where Mother was staying with her boyfriend, B.C., and J.C. Paraphernalia was found at the motel, and the police then met Mother at the courthouse. Mother consented to a search of her van and belongings, which resulted in drug paraphernalia and methamphetamine residue being discovered. Mother was arrested and charged with possession of paraphernalia and methamphetamine. She pled guilty and was placed on felony probation. B.C. and J.C. were removed from Mother's care and returned to Oregon.

Based upon Mother's failure to complete the terms of her Oregon case plans, failing to continue visitation with Z.C. in 2012, and her recent use of a controlled substance and arrest, the court found aggravated circumstances. This relieved the Department from having to prepare a case plan. Before the termination hearing, Mother gave birth to a fourth child, L.C., who currently lives with Mother in Jerome.

The magistrate also recounted the following testimony given at the March 2014 termination hearing in the memorandum decision. A speech therapist testified she started seeing Z.C. in February 2013, due to the child's difficulty communicating with others despite being over three years old. Over a one-year period, Z.C. experienced remarkable improvement, going from significantly delayed to almost communicating at her age level. The speech therapist surmised that the speech delays were caused by a lack of stimulation, and that the child's improvements were attributed to the hard work and dedication of the child and the foster parents. Mother did not participate in the therapy sessions over the year of treatment. Finally, the therapist noted that Z.C. would need another year or two of therapy sessions.

A medical health clinician, who was also Mother's adoptive mother, confirmed that Mother lost custody of her children in Oregon and that Z.C. was in foster care for approximately twenty months before being placed with the biological father. She testified that she was disappointed that Mother had not taken the necessary steps to get her children out of foster care on a permanent basis, and expressed concern over Mother's drug problem and continued association with abusive men. She testified that she provided Mother with financial and other assistance to help Mother make ends meet, and that Mother had not shown an ability to be self-reliant, needing to rely on government welfare. On the other hand, Mother's adoptive mother also testified that Mother was doing better than she had done in the past. She explained Mother had shown recent improvement likely coming from AA meetings, having a good support group, obtaining employment, and staying away from certain males. She also testified she was very impressed with Mother's care and parenting of Mother's fourth child. Though she hoped Mother's recent progress and sobriety would continue, she stated honestly that Mother's history did not show much stability.

A Twin Falls police officer testified regarding the arrest for possession of a controlled substance. The officer testified upon discovering paraphernalia in the motel room where Mother's children were present, the boyfriend admitted to smoking marijuana with Mother in the room. Upon contacting Mother at the courthouse and obtaining consent to search, the officer found a pipe with methamphetamine residue. Mother admitted to using controlled substances. One of Mother's two children, staying with her at the motel room, tested positive for exposure to methamphetamine. The children were removed from her care and returned to Oregon; they continued to remain in foster care at the time of the termination hearing.

Mother's probation officer testified that Mother had been compliant with the general provisions of her probation; however, Mother had not completed any of the special provisions of probation by the time of the hearing. The special provisions not completed include community service, obtaining a GED, and getting into drug treatment. Mother had not provided any proof that she had started community service or had begun pursuing a GED. Mother had also only recently enrolled in drug treatment as of January 2014. The magistrate noted concern that Mother had waited so long to begin treatment, given that her unstable lifestyle and losing custody of Z.C. was likely due to drug abuse. The probation officer noted that Mother continued to struggle with maintaining a clean home, describing one visit where Mother's apartment was so dirty that she would have called health and welfare if a child had been present at the time of the visit. She described the home as extremely cluttered and unsanitary. Finally, the probation officer recounted a domestic dispute occurrence between Mother and her then boyfriend, who is also the father of Mother's fourth child. From the probation officer's testimony, the magistrate, though crediting Mother's recent progress, found that Mother continues to struggle with the same or similar issues that led to Z.C. being removed from Mother's care in Oregon.

A social worker, employed by the Department, testified that Z.C. was removed from the biological father's care due to spanking that left bruising. Placement with Mother was not an option because she had an open child protection case in Oregon. The social worker expressed concern that Mother had been living with the boyfriend she had been told to stay away from.

The foster parent (Foster Mom), who began caring for Z.C. in January 2013, testified that when Z.C. came into her care, the child did not have the ability to communicate very well--only knowing ten to twelve words--and Z.C.'s teeth were in a condition that required dental repair. Z.C. acted out, exhibiting violent behavior when dealing with others. Foster Mom helped get Z.C.'s teeth fixed, began potty training the child, and dedicated a substantial time to help Z.C. effectively communicate with others. Foster Mom took Z.C. to speech therapy for over a year, with dramatic improvement. Foster Mom expressed concern that Mother missed half the scheduled visits with Z.C. during the year before the termination hearing, and that Mother had failed to contact the child by telephone. Foster Mom acknowledged that Z.C. recognized Mother, but she did not perceive a mother-daughter bond between them. Z.C. had not asked about Mother, and when a visit with Mother was missed, Z.C. did not become upset or act out. Foster Mom facilitated contact between Z.C. and her sisters in Oregon through telephone calls.

During the time Z.C. had been with Foster Mom, Z.C. had positive changes in speech, language, and social skills. Instead of hitting, biting, and fighting, the child now is social, smiles, and is a happy little girl. Foster Mom indicated she has bonded with Z.C. and is willing to adopt the child if the court terminates Mother's parental rights. The magistrate found Foster Mom honest and that she gave straightforward testimony, but the magistrate acknowledged that Foster Mom might be a bit biased given her bond with Z.C. and her desire to adopt the child.

A caseworker, employed by the Oregon Department of Health and Welfare, testified that Z.C.'s child protection case in Oregon began in 2010 because of Mother's unstable living environment, her failure to protect the child from potentially dangerous men, and unclean living conditions. A case plan was established, that included visitation with Z.C., for Mother to gain effective living skills, parenting skills, and stable housing. The caseworker indicated that Mother failed to complete the case plan and eventually quit exercising her visitation with Z.C. This led to placement of Z.C. with her biological father.

A client services technician, employed by the Department, testified she transported Mother to scheduled visitations with Z.C. She testified that Mother missed twelve out of the twenty-seven scheduled visits during 2013 and 2014. Some of the visits were missed due to illness, while others were missed because Mother was attending other appointments such as counseling or drug treatment. The client services technician described Mother's engagement with Z.C. as appropriate and attentive to the child's needs. She also indicated that Z.C. enjoyed playing with L.C., and thought that Z.C. recognized Mother as her mom.

The guardian ad litem testified that she was concerned Z.C. had spent a majority of her life in foster care, or away from Mother. She acknowledged that Mother had always been cooperative, but that Mother had not demonstrated the willingness to gain the necessary life skills. The guardian ad litem testified she was disappointed that Mother made such little progress since the petition to terminate was filed. She testified that despite the recent steps taken by Mother to improve her situation, it was in Z.C.'s best interest to terminate Mother's parental rights.

Another social worker, employed by the Department, testified he was assigned to Z.C.'s child protection case. He explained that no case plan was developed due to the court finding aggravated circumstances after Mother's arrest. Despite this, the social worker gave Mother a number of tasks to accomplish to try and gain the skills needed to care for Z.C. He

5

acknowledged that Mother had maintained housing since July 2013, had obtained part-time employment, and recently began drug treatment. The social worker also thought Mother was trying hard, but noted she still had not fully completed any tasks. The social worker gave his opinion that it was in the best interest of Z.C. to terminate Mother's parental rights. He based this on Mother's history in the case, her minimal progress during the year since termination was sought, and from Z.C. being in foster care for the majority of her life. He believed Z.C.'s need for stability and history of the case outweighed Mother's desire for more time to show she can maintain stability in her life.

Mother's biological sister testified that she lived with Mother and L.C. in a two-bedroom apartment in Jerome. Though she was living with Mother, she did not have a grasp of what Mother did on a weekly or daily basis. Mother's sister testified that she knew Mother had a few part-time jobs, and thought she made enough to pay the bills. She acknowledged that they received government assistance and support from family and friends. She admitted that their home and her room were sometimes messy, but blamed the condition on her not owning a dresser for her clothes. She testified that she was supporting Mother in her drug recovery and attended AA meetings with Mother. She thought Mother is a good parent for her children.

Mother's biological aunt testified that Mother had a history of moving around, using drugs, associating with violent men, and being unstable. She claims that Mother experienced a change after Mother's fourth child was born. She thought that Mother was trying to change her ways so that she can provide a more stable life for herself and her children, and attributed the change in attitude to Mother's current sobriety. The aunt also described Mother's fourth child as having the inability to digest protein properly. She believed that Mother was doing well to address the infant's special needs.

Finally, Mother testified that Z.C. was taken from her care when Z.C. was approximately eight months old, and that the child had not lived with her since 2010. Mother did not deny that she failed to reunite with Z.C. or that the child was placed with the biological father in 2012 when she failed to reunite with the child. Mother explained that her second child was taken immediately after her birth because she allowed the child's father to be present during delivery despite knowing he had a history with child protective services. She admitted trying methamphetamine a few months after that child's birth. She did not identify when she started using other controlled substances, but admitted that she continued using methamphetamine up

until March 2013. As of July 2013, Mother has been working part-time at minimum wage jobs. She received government assistance for food and healthcare. The father of her fourth child had also supported her financially, despite no formal child support order, and purchased a van for her. He agreed to pay over $2,000 for the past due rent on Mother's apartment, intending to pay with his income tax refund. Mother confirmed she started her drug treatment in January 2013, but she held off getting her assessment and attending an actual treatment program until she completed other tasks, found employment, and gave birth to her fourth child. Mother testified that her fourth child convinced her she needed to be a better parent. She acknowledged when Z.C. was taken that she was combative and blind to her issues, but since her most recent child was born she recognized she needs to change.

Mother also testified that she thought her visits with Z.C. went well, and that her fourth child and Z.C. share a close bond and connection. Mother expressed concern that it would be detrimental to both Z.C. and L.C. if they were separated. The magistrate indicated that Mother did not really describe any bond between herself and the child. Mother also explained the missed visits with Z.C. were due to her being on bed rest during pregnancy, and the Department's reluctance to transport her during what was a high-risk pregnancy. Mother testified that living drug-free has helped her be a better mom, and guaranteed success if she is given additional time to try and reunite with Z.C. She testified she has a support system including her aunt, adoptive mother, her sister, her probation officer, and her AA family. Mother admitted she had drug and paraphernalia in her possession when she was arrested, that she made bad choices in having certain men in her life, and that her kids were with her when she was using illegal drugs. She acknowledged she had yet to obtain a mental health assessment, indicating that she "spaced it." Mother acknowledged that she was $2,000 behind in rent, but noted the agreement with the landlord wherein L.C.'s father would make it up.

The magistrate characterized most of Mother's testimony as focusing on how much time and effort she had spent on learning to parent L.C., and not nearly as much on what she had done to help be a parent for Z.C. The magistrate noted that Z.C. had spent a majority of her life in foster care, and that during this time Mother had not put forth the effort needed to address her issues and reunite with the child. The magistrate found that Mother had the ability to do so, but apparently chose not to. The magistrate also found that without the support of L.C.'s father and

others, Mother would not be able to make ends meet, and that she would continue to associate with L.C.'s father, even when told she is not to do so.

After receiving evidence and hearing from the witnesses, the magistrate terminated Mother's parental rights over Z.C. Based on his consent, the magistrate also terminated the father's parental rights. Mother timely appeals.

## II.

## ANALYSIS

In an action to terminate parental rights, due process requires this Court to determine if the magistrate's decision was supported by substantial and competent evidence. *In re Doe*, 143 Idaho 343, 345, 144 P.3d 597, 599 (2006). Substantial and competent evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id*. at 345-46, 144 P.3d at 599-600. This Court will indulge all reasonable inferences in support of the trial court's judgment when reviewing an order that parental rights be terminated. *Doe v. Doe*, 148 Idaho 243, 246-47, 220 P.3d 1062, 1064-65 (2009). We conduct an independent review of the record that was before the magistrate. *Doe*, 143 Idaho at 346, 144 P.3d at 600.

A parent has a fundamental liberty interest in maintaining a relationship with his or her child. *Doe v. State*, 137 Idaho 758, 760, 53 P.3d 341, 343 (2002); *see also Quilloin v. Walcott*, 434 U.S. 246, 255 (1978). This interest is protected by the Fourteenth Amendment to the United States Constitution. *State v. Doe*, 144 Idaho 839, 842, 172 P.3d 1114, 1117 (2007). "Implicit in [the Termination of Parent and Child Relationship Act] is the philosophy that wherever possible family life should be strengthened and preserved . . . ." I.C. § 16-2001(2). Therefore, the requisites of due process must be met when the Department intervenes to terminate the parent-child relationship. *State v. Doe*, 143 Idaho 383, 386, 146 P.3d 649, 652 (2006). Due process requires that the Department prove grounds for terminating a parent-child relationship by clear and convincing evidence. *Id*. Idaho Code § 16-2005 permits the Department to petition the court for termination of the parent-child relationship when it is in the child's best interest and any one of the following five factors exist: (a) abandonment; (b) neglect or abuse; (c) lack of a biological relationship between the child and a presumptive parent; (d) the parent is unable to discharge parental responsibilities for a prolonged period which will be injurious to the health, morals, or well-being of the child; or (e) the parent is incarcerated and will remain incarcerated

8

for a substantial period of time. Each statutory ground is an independent basis for termination. *Doe*, 144 Idaho at 842, 172 P.3d at 1117.

Idaho Code § 16-2002(3) defines "neglect" as any conduct included in I.C. § 16-1602(26), as well as situations where the parent has failed to comply with the court's orders or the case plan in a Child Protective Act case and the Department has had temporary or legal custody of the child for fifteen of the most recent twenty-two months and reunification has not been accomplished by the last day of the fifteenth month in which the child has been in the temporary or legal custody of the Department. Section 16-1602(26)(a) provides, in pertinent part, that a child is neglected when the child is without proper parental care and control, or subsistence, medical or other care or control necessary for his or her well-being because of the conduct or omission of his or her parents, guardian, or other custodian or their neglect or refusal to provide them.

Mother argues the magistrate could not rely on incarceration in finding neglect because she was on probation and continues to do well on probation. However, the magistrate did not rely on Mother's probationary status, let alone incarceration, in determining neglect. She also argues that her drug problem, in and of itself, is not a reason to terminate parental rights. Though the magistrate relied on her history of addiction, the magistrate credited Mother for recently attempting rehabilitation but concluded, based on all the information available, that Mother had neglected Z.C. and her drug use was a factor. The magistrate did not base the finding of neglect solely on Mother's drug addiction.

Mother also argues that she cannot be blamed for the harm caused to Z.C. by her father because she attempted to keep her from being placed with him. Though she is correct that she cannot be faulted for father's conduct in caring for Z.C., the magistrate properly relied on her failure to comply with her Oregon case, for abandoning her visitation rights with Z.C. in Oregon, and continuing prohibited relationships during the Oregon proceedings. Further, the magistrate specifically noted that when Z.C. was removed and placed into the Department's care in Idaho, Z.C. was not under the care of Mother. It is plain that the magistrate did not rely on any mistreatment by father in determining that Mother neglected Z.C.

Mother next contends that she possessed stable housing. The testimony revealed that Mother was living in an apartment with her biological sister at the time of the hearing. She had been living there for roughly seven months. The magistrate found that Mother was unable to

provide a clean and safe living environment. The magistrate noted that an unclean and unsafe house was one of the reasons Z.C. was removed in Oregon, and that the housing conditions had not changed since then. The magistrate found that the motel Mother stayed in, where paraphernalia was found, was not a safe environment for children. Despite this, Mother brought two of her children into that environment, where she admitted smoking marijuana in the room. The magistrate acknowledged that Mother had found the apartment to share with her sister, but concluded this was not a stable housing situation. Mother was $2,000 behind in rent, and dependent on the father of her fourth child to pay the rent with his income tax refund. This reliance, and help from others, led the magistrate to find that Mother's housing situation remained unstable. The magistrate also noted that the condition of the apartment was described as filthy and cluttered, and so unsanitary that the probation officer testified she would have called the Department if a child had been present at the time of her visit. There is substantial evidence to support the magistrate's finding that Mother was unable to provide suitable housing.

Beyond that which Mother challenges on appeal, the magistrate also supported the finding of neglect based on Mother's failure to complete any programs for her current felony probation, and the failure to complete the case plan in Oregon. Though Mother made recent strides in completing some programming, the magistrate found the lack of completion of any courses in the one-year period since Z.C.'s removal unjustifiable. Mother also did not take advantage of numerous opportunities to visit with Z.C.; the magistrate found that Mother missed twelve of the scheduled visitations. The magistrate acknowledged that some of the absences were justified, based on Mother being on bed rest during her fourth pregnancy, but the magistrate concluded that since the Oregon case plan, Mother had limited contact with Z.C though she had the opportunity to do so.

The magistrate also considered Mother's financial instability since Z.C. was removed from her care in Oregon. The magistrate credited Mother for her recent part-time employment, but also noted that she continues to rely on the financial assistance of others. The father of her fourth child is helping with rent and helped purchase a van for her. Weighed against the instability of the previous years to support herself, the magistrate found that Mother continued to be financially unstable.

Based upon the foregoing, the magistrate found that Mother had neglected Z.C. Upon reviewing the record, we hold that there is substantial and competent evidence to support the magistrate's finding of clear and convincing evidence of neglect.

Further, though Mother does not challenge the finding on appeal, we also uphold the magistrate's finding that it is in the best interest of Z.C. to terminate Mother's parental rights. The magistrate relied on the opinions of the social worker, the guardian ad litem, and other care providers in determining that it was in the child's best interest to terminate the parental rights. The professionals acknowledged the gains Mother had made the months immediately before the termination hearing, but concluded that based on the child being in foster care for a majority of her life, Mother's inability to support herself, and Z.C.'s need for stability, that termination was in Z.C.'s best interest. The magistrate agreed with their assessment. The magistrate found that Mother's history of moving, her past unemployment, unsanitary living conditions, and her drug use without seeking treatment showed that Mother lacked stability in her life, and would struggle to maintain what little stability she had gained. The magistrate also reasoned that Mother continually disregarded the physical, emotional, and educational needs of Z.C., placing her own needs before the child's. There is substantial and competent evidence to support the magistrate's finding that it was in Z.C.'s best interest to terminate Mother's parental rights.

## III.
## CONCLUSION

The magistrate's finding of clear and convincing evidence that Mother neglected Z.C., and that it was in the child's best interest to terminate Mother's parental rights, is supported by substantial and competent evidence. Therefore, the order terminating Mother's parental rights is affirmed.

Judge LANSING and Judge MELANSON **CONCUR.**